**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| R1 RCM INC. and R1 RCM HOLDCO INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> KYLE HICOK, <br><br> *Defendant*. | Case No. 25-11397 |

## COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs R1 RCM Inc. and R1 RCM Holdco Inc. (collectively, "R1"), by and through their undersigned counsel, make this Complaint against Defendant Kyle Hicok, R1's former President of Revenue Performance Solutions, alongside R1's motion for preliminary injunction, to enforce Mr. Hicok's restrictive covenant obligations and to prevent the imminent misuse of R1's confidential information and trade secrets.

### NATURE OF ACTION

1. R1 brings this action to enforce the restrictive covenant obligations that Mr. Hicok voluntarily undertook in exchange for millions of dollars in equity and other compensation and to prevent Mr. Hicok's improper use of R1's closely guarded and competitively sensitive confidential and trade secret information.

2. R1 is a leading provider of technology-driven revenue cycle management ("RCM") solutions that transform the patient experience and financial performance of healthcare providers. The R1 platform brings the power of artificial intelligence and next-level expertise to healthcare

1

through proprietary RCM optimization engines that turn complex data into financial and operating performance improvements.

3.      Mr. Hicok joined R1 in June 2022 as part of R1's acquisition of Cloudmed, where he had previously served as President and was intimately involved in the acquisition negotiations and due diligence process. Throughout his tenure at R1, Mr. Hicok held progressively senior leadership positions with increasing access to R1's most sensitive and protected confidential business information, including trade secrets. Upon joining R1, Mr. Hicok initially served in the role of Executive Vice President, Modular Solutions, reporting directly to Lee Rivas, President of R1. In 2023, Mr. Hicok was promoted to Chief Commercial Officer, a position he held for two years. Most recently, in January 2025, Mr. Hicok was named President, Revenue Performance Solutions.

4.      In each of these roles at R1, Mr. Hicok used, developed, and had access to R1's confidential information and trade secrets, including proprietary client pricing models and contract terms, and R1's processes for optimizing revenue cycle operations. Accordingly, as part of his employment with R1, Mr. Hicok executed numerous employment and equity agreements that contained, among other things, non-competition, confidentiality, non-solicitation, and non-disparagement provisions. These contractual obligations were designed to protect R1's legitimate business interests given Mr. Hicok's extensive access to confidential and proprietary information throughout his various leadership roles at the company.

5.      In August 2025, Mr. Hicok informed R1 that he was leaving R1.

6.      Given Mr. Hicok's access to and use of R1's confidential information and trade secrets, and given Mr Hicok's affirmative obligation not to join any business that competed with R1 for a period of at least 24 months, R1 asked Mr. Hicok prior to his departure from R1 to disclose

where he planned to work after his exit from R1. Mr. Hicok, however, refused to disclose his subsequent employment intentions to R1.

7. Mr. Hicok's resignation from R1 was effective on August 28, 2025. Subsequently, R1 discovered that Mr. Hicok has agreed to join RSource LLC (d/b/a Knowtion Health) as its new Chief Executive Officer.

8. Knowtion Health is a direct competitor of R1. Like R1, Knowtion Health is a healthcare revenue cycle management company that claims to specialize in resolving denied and complex claims, recovering low balance accounts, and defending against payer audits. As such, Knowtion Health competes within the exact same marketplace as R1, targeting the very same customer base. Accordingly, Mr. Hicok's restrictive covenant obligations bar him from joining Knowtion Health as its Chief Executive Officer, which would result in his inevitable disclosure and misuse of R1's confidential information and trade secrets.

9. Knowtion Health is a portfolio company of a fund managed by Arsenal Capital Management LP ("Arsenal"), a leading private equity firm that specializes in building technology-rich, market-leading healthcare and industrial growth companies. Arsenal has undertaken a concerted campaign to build Knowtion Health into a competitor of R1 through acquisitions and raids of R1 employees. In June 2025, Arsenal engineered Knowtion Health's acquisition of Switch RCM, a data- and technology-first company in the revenue recovery space. Arsenal also directed Knowtion Health's efforts to unlawfully poach R1's executives and other key employees and steal R1's confidential and trade secret information in order to fast track Knowtion Health's attempted rise in the RCM industry. In fact, in the months leading up to Mr. Hicok's departure from R1, Arsenal's partners were in contact with Mr. Hicok, including meeting with Mr. Hicok in person on several occasions.

10.     Upon learning of Mr. Hicok's intent to obtain a leadership role with a direct competitor in breach of his agreements with R1, R1 conducted an internal investigation of Mr. Hicok's pre-departure conduct.  In so doing, R1 learned that Mr. Hicok was involved in an effort to (1) undermine the interests of R1 management and stockholders by encouraging vital R1 employees to seek employment with Knowtion Health in violation of the terms of their employment and equity agreements; (2) encourage his subordinates to disregard key legal covenants of their employment agreements; and (3) advocate for relaxed restrictive covenant language in R1's employment and equity agreements.

11.     In particular, and without limitation, in violation of Mr. Hicok's contractual and fiduciary obligations to R1, and prior to his departure from R1, Mr. Hicok, upon information and belief, began coordinating Knowtion Health's and Arsenal's corporate raid of R1's key employees and otherwise preparing to compete with R1 by using R1's confidential information and trade secrets.

12.     R1 seeks preliminary and permanent injunctive relief to prevent Mr. Hicok from breaching his contractual obligations to R1 and to protect R1's confidential information and trade secrets.  The Court's intervention is necessary to prevent irreparable harm to R1's business operations, competitive position, and confidential information.

13.     R1 also seeks damages for Mr. Hicok's willful breach of his contractual and fiduciary obligations and his violation of the Defend Trade Secrets Act and Illinois Trade Secrets Act; disgorgement of certain equity compensation R1 paid to Mr. Hicok; and attorneys' fees and costs.

**PARTIES**

14.     Plaintiffs R1 RCM Inc. and R1 RCM Holdco Inc. are Delaware corporations with their principal place of business at 433 W. Ascension Way, Suite 200, Murray, Utah 84123. Plaintiffs are therefore citizens of Delaware and Utah.  Plaintiffs have principal operations in Illinois and provide revenue cycle management services to healthcare providers across the United States.

15.     Defendant Kyle Hicok is a citizen of Minnesota.  He served in various senior executive roles with R1 from 2022 until August 2025 and his responsibilities and reporting obligations were principally directed to R1's business operations out of Chicago, Illinois.

**JURISDICTION AND VENUE**

16.     This Court has subject-matter jurisdiction pursuant to the Defend Trade Secrets Act, 18 U.S.C. §1836.

17.     This Court also has subject-matter jurisdiction over this matter because there is complete diversity between the parties, and the amount in controversy exceeds $75,000.

18.     To the extent necessary, this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

19.     This Court has personal jurisdiction over Mr. Hicok because he consented to the jurisdiction of courts in Illinois in his equity agreements with R1.  These agreements are discussed more fully below.

20.     Venue is proper in Cook County, Illinois pursuant to Mr. Hicok's equity agreements, which include mandatory forum selection clauses that name Illinois as the venue for claims pertaining to Mr. Hicok's restrictive covenants.  Venue is also proper because R1 maintains

substantial operations in Illinois and Mr. Hicok agreed that he would be expected to travel regularly to R1's Chicago office.  (*See* January 6, 2025 Employment Agreement, Ex. C at ¶ 3.)

## FACTUAL ALLEGATIONS

### A.    The RCM Industry, R1, and Knowtion Health.

21.     Revenue cycle management is the process used by healthcare systems to track revenue from patients, starting from a patient's initial appointment with the healthcare system and ending with final payment.  It comprises all the activities that lead to payment for services provided, from patient registration to verification of benefits to care delivery, claim submission and reimbursement.  It also involves communication — with patients, insurance companies, and government payers such as Medicare and Medicaid.  RCM is essential for ensuring the financial health of healthcare organizations by optimizing the revenue collection process.

22.     The RCM industry is very competitive, with a U.S. market size estimated at over $100 billion, and is expected to experience significant growth over the next five years.  The outsourcing of RCM by healthcare providers has grown and will continue to grow due to the complexity and labor-intensive nature of RCM processes, the need for cost-effective solutions, and the challenges posed by stringent regulations, financial pressures, and staff shortages in the healthcare industry.  Therefore, healthcare providers are increasingly opting to outsource RCM tasks to specialized companies to streamline processes, reduce costs, improve accuracy, and focus on patient care over administrative tasks.

23.     R1 has been recognized by various trade and industry publications as a major player in the RCM sector.  R1 is a leading provider of technology-driven RCM solutions that transform the patient experience and financial performance of healthcare providers.  The R1 platform brings the power of artificial intelligence and next-level expertise to healthcare through proprietary RCM optimization engines that turn complex data into financial and operating performance

improvements. Through years of investment and innovation, R1 has developed close partnerships with healthcare providers to provide exceptional RCM services to its customers and clients. R1 employs approximately 30,000 employees and has over 1,000 clients across the United States.

24. Knowtion Health, f/k/a RSource, is a competing RCM business seeking to be a major player in the RCM industry. In an effort to catch up to companies like R1, Knowtion Health has undertaken a campaign to expand its RCM operations through acquisitions and raiding the employees of other RCM providers, especially R1. In June 2025, Knowtion Health announced the acquisition of Switch RCM, a data- and technology-first company in the revenue recovery space. And, in partnership with Arsenal, Knowtion Health has engaged in a coordinated effort over the past several months to unlawfully poach several of R1's executives and other key employees in order to steal R1's confidential and trade secret information and to fast track its attempted rise in the RCM industry. In fact, it was Arsenal that reached out and met with Mr. Hicok several times in the months leading up to his resignation from R1.

**B.     Mr. Hicok's Leadership Positions at R1.**

25. Mr. Hicok joined R1 in June 2022 as part of R1's acquisition of Cloudmed, where Mr. Hicok previously served as President. As Cloudmed's President, Mr. Hicok was intimately involved in the negotiations and due diligence leading to the acquisition of Cloudmed by R1. As such, Mr. Hicok was given access to sensitive and proprietary business information relevant to the acquisition.

26. Upon joining R1 in 2022, Mr. Hicok undertook the role of Executive Vice President, Modular Solutions, reporting directly to R1's then-President Lee Rivas. In that role, Mr. Hicok had oversight of R1's workforce and access to detailed information regarding R1's operations, business processes, cost and pricing information, proprietary technology, and customer lists.

27.     In 2023, Mr. Hicok became Chief Commercial Officer ("CCO") of R1.  As CCO, Mr. Hicok's duties and responsibilities inextricably linked him to R1's confidential and trade secret information, including R1's financial reports and budgets; data on sales performance, marketing campaigns, and customer acquisition efforts; insights into competitive dynamics and customer behavior; and data on new business opportunities, strategic partnerships, and market expansion plans.  Mr. Hicok not only had access to such confidential and trade secret information, but he was also involved in its development and creation.  Mr. Hicok held the CCO role for two years.

28.     In January 2025, Mr. Hicok was named R1's President, Revenue Performance Solutions ("RPS").  R1's RPS business is integral to R1's RCM business and delivers a comprehensive set of revenue performance solutions to optimize, accelerate, and navigate revenue recovery for healthcare providers.  R1 is the only RCM provider with the range of technology-enabled solutions and broad expertise to improve accuracy and efficiency and drive fast results across all revenue cycle stages.  As President of RPS, Mr. Hicok had access to and was involved in the development and creation of confidential and trade secret documents, including R1's strategies, initiatives, and growth opportunities in the RPS sector.  As the RPS leader, Mr. Hicok was responsible for delivering solutions to over 580 healthcare system clients, growing the business, and driving solution innovation across the revenue cycle.

29.     R1's business model in revenue cycle management requires building long-term relationships with healthcare providers.  The confidential terms of R1's agreements with providers—including the pricing structures, service delivery models, and system access requirements to which Mr. Hicok had access—reflect R1's competitive advantage in a highly competitive industry.

8

30.     Recognizing the highly sensitive nature of the information that Mr. Hicok regularly developed and used in his role and to which he had access, R1 required him to execute multiple agreements to protect this confidential and trade secret information.  As Mr. Hicok himself acknowledged in his 2023 Employment Agreement (Ex. B, ¶ 4), "by virtue of [his] role with R1" he had "access to" and was "involved in the formulation of[] certain confidential and trade secret information of R1" and he "could materially harm the business of R1 by competing with R1 or soliciting employees or customers of R1."

### C.     Mr. Hicok Agreed to Protect R1's Confidential Information, Trade Secrets, and Business Interests.

31.     In exchange for his senior position and millions of dollars in equity and other compensation, Mr. Hicok made extensive promises to protect R1's business interests through a series of contracts he executed during his employment at R1.

32.     The employment agreements set forth Mr. Hicok's compensation and benefits in exchange for, among other things, his promises to abide by restrictive covenants.   These agreements include the following: (1) a June 19, 2022 Employment Agreement (Ex. A); (2) a January 5, 2023 Employment Terms and Restrictive Covenant Agreement (Ex. B); and (3) a January 6, 2025 Employment Agreement (Ex. C) and incorporated January 6, 2025 Proprietary Interests Protection Agreement ("PIPA") (Ex. D) (collectively, the "Employment Agreements").

33.     In Mr. Hicok's January 6, 2025 Employment Agreement, he agreed "that the provisions of this Agreement . . . are in addition to and complement (and do not supersede) any other written agreement(s) or parts thereof between you and [R1] or any of its affiliates that create restrictions on you with respect to confidentiality, non-disclosure, non-competition, non-solicitation, or non-disparagement."  (Ex. C at ¶ 17.)

9

34.     Mr. Hicok also signed several equity agreements granting him restricted stock units in exchange for promises not to use or disclose confidential information and to abide by non-solicitation, non-competition, and non-disparagement clauses. Mr. Hicok agreed to these provisions at least six times between 2022 and 2025 as part of stock awards granting him at least 351,455 restricted units worth more than $5,000,000.

35.     The equity agreements include: (1) a June 21, 2022 Grant of Performance Based Awards Agreement (Ex. E); (2) a May 2, 2023 Grant of Performance Based Awards Agreement (Ex. F); (3) a May 2, 2023 Restricted Stock Unit Award Agreement (Ex. G); (4) a June 1, 2024 Grant of Performance Based Awards Agreement (Ex. H); (5) a June 1, 2024 Restricted Stock Unit Award Agreement (Ex. I); and (6) a January 5, 2025 Class P Unit Award Agreement (Ex. J) (collectively, the "Equity Agreements").

36.     R1 always included and Mr. Hicok always agreed to restrictive covenants in his various Employment and Equity Agreements.

37.     In Mr. Hicok's various contractual agreements, he agreed that the restrictive covenant obligations were necessary for the protection of R1's business, R1's confidential information, and R1's customer relationships, and that any breach would cause R1 substantial, continuing, and irrevocable harm.

### i.     Mr. Hicok's Non-Competition Agreements with R1.

38.     In Mr. Hicok's January 5, 2023 Employment Agreement, he agreed that:

> During the time of [his] employment for R1 and for a period of **twenty-four (24) months** after the termination of [his] employment for R1, regardless of the reason, [he] shall not, directly or indirectly, either alone or in conjunction with any person, firm, association, company or corporation . . . **own, manage, operate, or participate in the ownership, management, operation, or control of, or provide services (including as an employee, contractor, or other service provider) to, any person or entity which is in competition**

10

> **with R1** where [he] would hold a position or have duties or engage
> in activities that (A) are similar to or include those duties that [he]
> engaged in during the last twelve (12) months of [his] employment
> with R1; (B) would require [him] to have responsibility for or access
> to confidential information that is similar to or relevant to the
> Confidential Information that [he] had responsibility for or access to
> during the last twelve (12) months of [his] employment with R1; or
> (C) would likely or inevitably involve [his] use or disclosure of R1's
> Confidential Information.

(Ex. B at ¶ 4.e.i. (emphasis added).)

39. Under the 2022, 2023, and 2024 Grant of Performance Based Awards Agreements,

Mr. Hicok agreed that:

> During the time in which [he] performs services for the Company
> and for a period of twelve months after the cessation of [his] service
> to the Company, regardless of the reason, **[he] shall not, directly
> or indirectly, either alone or in conjunction with any Person,
> within the Restricted Area, own, manage, operate, or
> participate in the ownership, management, operation, or
> control of, or be employed by or provide services to, a
> Competing Business**.

(Ex. E ¶ 9(f); Ex. F ¶ 9(f); Ex. H ¶ 9(f) (emphasis added).)

40. Under the 2023 and 2024 Restricted Stock Unit Award Agreements, Mr. Hicok

agreed that:

> During the time in which [he] performs services for the Company
> and for a period of twelve (12) months after the cessation of [his]
> service to the Company, regardless of the reason, **[he] shall not,
> directly or indirectly, either alone or in conjunction with any
> person, firm, association, company or corporation, within the
> Restricted Area, own, manage, operate, or participate in the
> ownership, management, operation, or control of, or be
> employed by or provide services to, any entity which is in
> competition with the Company**.

(Ex. G ¶ 9(f)(i); Ex. I ¶ 9(f)(i) (emphasis added).)

### ii. Mr. Hicok's Confidentiality Agreements with R1.

41. In Mr. Hicok's January 5, 2023 Employment Agreement, he agreed that he:

> **[W]ill not**, without R1's prior written permission, directly or indirectly, utilize for any purpose other than for a legitimate business purpose solely on behalf of R1, or directly or indirectly, **disclose to anyone outside of R1, either during or after [his] employment with R1 ends, R1's Confidential Information**, as long as such matters remain Confidential Information.

(Ex. B at ¶ 4.b (emphasis added).)

42.     In Mr. Hicok's January 6, 2025 PIPA Agreement, he agreed that he:

> **[W]ill not,** without the Company's prior written permission, directly or indirectly, utilize for any purpose other than for a legitimate business purpose solely on behalf of the Company, or **directly or indirectly, disclose to anyone outside of the Company, either during or after [his] employment or relationship with the Company ends, the Company's trade secrets and other Confidential Information**, as long as such matters remain trade secrets under applicable law or in the case of Confidential Information which is not a trade secret, for two (2) years after the Termination Date.

(Ex. D at ¶ E.1 (emphasis added).)

43.     In Mr. Hicok's 2022-2024 Equity Agreements, he agreed that he:

> **[W]ill not**, without the Company's prior written permission, directly or indirectly, utilize for any purpose other than for a legitimate business purpose solely on behalf of the Company, or directly or indirectly, **disclose to anyone outside of the Company, either during or after [his] relationship with the Company . . . the Company's Confidential Information**, as long as such matters remain Confidential Information.

(Ex. E ¶ 9(c)(i); Ex. F ¶ 9(c)(i); Ex. G ¶ 9(c)(i); Ex. H ¶ 9(c)(i); Ex. I ¶ 9(c)(i) (emphasis added).)

### iii.    Mr. Hicok's Non-Solicitation Agreements with R1.

44.     In his January 5, 2023 Employment Agreement, Mr. Hicok agreed that:

> **During the time in which [he] perform[s] services for R1 and for a period of twenty-four (24) months** after the termination of [his] employment with R1, regardless of the reason, [he] shall not, directly or indirectly, either alone or in conjunction with any person, firm, association, company or corporation: i. **Hire, recruit, solicit**

> or otherwise attempt to employ or retain or enter into any business relationship with, any person who is or was an employee of R1 within the twelve (12) month period immediately preceding the termination of [his] employment with R1; or ii. Solicit the sale or licensing of any products or services that are similar to or competitive with products or services offered by, manufactured by, designed by, or distributed by the Company, to any person, company or entity which was or is a customer or potential customer of the Company for such products or services.

(Ex. B at ¶ 4.a (emphasis added).)

45.     In his 2022, 2023, and 2024 Grant of Performance Based Awards Agreements, Mr. Hicok agreed that:

> During the period in which [he] performs services for the Company and for a period of eighteen months after [he] ceases to perform services for the Company, regardless of the reason, **[he] shall not, directly or indirectly, either alone or in conjunction with any Person: (i) hire, recruit, solicit, or otherwise attempt to employ or retain or enter into any business relationship with, any individual who is or was an employee of the Company** within the twelve-month period immediately preceding the cessation of [his] service with the Company; or (ii) solicit the sale of any products or services that are similar to or competitive with products or services offered by, manufactured by, designed by, or distributed by the Company, to any Person which was or is a customer or potential customer of the Company for such products or services.

(Ex. E at ¶ 9(b); Ex. F at ¶ 9(b); Ex. H at ¶ 9(b) (emphasis added).)

46.     In his 2023 and 2024 Restricted Stock Unit Award Agreements, Mr. Hicok agreed that:

> During the time in which [he] performs services for the Company and for a period of eighteen (18) months after [he] ceases to perform services for the Company, regardless of the reason, **[he] shall not, directly or indirectly, either alone or in conjunction with any person, firm, association, company or corporation: (i) Hire, recruit, solicit or otherwise attempt to employ or retain or enter into any business relationship with, any person who is or was an employee of the Company** within the twelve (12) month period immediately preceding the cessation of [his] service with the Company; or (ii) Solicit the sale of any products or services that are similar to or competitive with products or services offered by,

> manufactured by, designed by, or distributed by Company, to any person, company or entity which was or is a customer or potential customer of Company for such products or services.

(Ex. G at ¶ 9(b); Ex. I at ¶ 9(b) (emphasis added).)

### iv. Mr. Hicok's Non-Disparagement Agreements with R1.

47. In his January 5, 2023 Employment Agreement, Mr. Hicok agreed to:

> [N]ot disparage R1, its officers, directors, administrators, representatives, employees, contractors, consultants or customers and will not engage in any communications or other conduct which might interfere with the relationship between R1 and its current, former, or prospective employees, contractors, consultants, customers, suppliers, regulatory entities, and/or any other persons or entities.

(Ex. B at ¶ 4.i.)

48. In his January 6, 2025 PIPA Agreement, Mr. Hicok agreed that:

> [He] will not disparage [R1], its officers, directors, administrators, representatives, employees, contractors, consultants or customers and will not engage in any communications or other conduct which might interfere with the contracts and relationships, or prospective contracts and relationships between [R1] and its current, former, or prospective employees, contractors, consultants, customers, suppliers, regulatory entities, and/or any other persons or entities.

(Ex. D at ¶ N.)

49. In his 2022, 2023, and 2024 Grant of Performance Based Awards Agreements, Mr. Hicok agreed:

> [N]ot to disparage the Company, its officers, directors, administrators, representatives, employees, contractors, consultants, or customers or engage in any communications or other conduct that might interfere with the relationship between the Company and its current, former, or prospective employees, contractors, consultants, customers, suppliers, regulatory entities, and/or any other Person.

(Ex. E at ¶ 9(j); Ex. F at ¶ 9(j); Ex. H at ¶ 9(j).)

50. In his 2023 and 2024 Restricted Stock Unit Award Agreements, Mr. Hicok agreed:

14

> Participant understands and agrees that Participant will not disparage the Company, its officers, directors, administrators, representatives, employees, contractors, consultants or customers and will not engage in any communications or other conduct which might interfere with the relationship between the Company and its current, former, or prospective employees, contractors, consultants, customers, suppliers, regulatory entities, and/or any other persons or entities.

(Ex. G at ¶ 9(j); Ex. I at ¶ 9(j).)

**v.    R1's Rights to Clawback Equity Awards.**

51.    In his 2022, 2023, and 2024 Grant of Performance Based Awards Agreements, Mr. Hicok agreed:

> [I]n the event of any breach of any of the restrictive covenants in this Agreement by the Participant, the Participant agrees that (i) any PBRSU Shares issued by the Company to the Participant pursuant to this Agreement shall be forfeited for no consideration; (ii) **in the event that the Participant sold the PBRSU Shares issued to the Participant pursuant to this Agreement, then the Participant shall be required to pay to the Company in cash, within thirty (30) days of a request by the Company for such payment, the price at which the Participant sold the shares**; and (iii) in the case of unvested Granted PBRSUs, such unvested Granted PBRSUs will automatically be forfeited for no consideration.

(Ex. E at ¶ 9(h); Ex. F at ¶ 9(h); Ex. H at ¶ 9(h) (emphasis added).)

52.    In his 2023 and 2024 Grant of Restricted Stock Units Agreements, Mr. Hicok agreed:

> [I]n the event of any breach of any of the restrictive covenants in this Agreement by Participant, the Participant agrees that (i) any shares of Restricted Stock issued by the Company to the Participant pursuant to this Agreement shall be forfeited for no consideration and **(ii) in the event that the Participant sold the shares of Restricted Stock issued to the Participant pursuant to this Agreement, then the Participant shall be required to pay to the Company in cash, within thirty (30) days of a request by the Company for such payment, the price at which the Participant sold the shares**.

(Ex. G at ¶ 9(h); Ex. I at ¶ 9(h) (emphasis added).)

15

**D.  R1 Protects Its Confidential and Trade Secret Information.**

53.  R1 collects and generates a variety of confidential, proprietary, and trade secret information, including financial data concerning sales, revenues, and profit margins; detailed customer lists; operational procedures and processes; marketing strategies; employee information; patient protected health information; and RCM technology.

54.  To protect this information, R1 requires employees to sign agreements—such as Mr. Hicok's Employment and Equity Agreements—that restrict the use, disclosure, and retention of R1's protected confidential and trade secret information.

55.  R1 also implements a number of additional security measures to safeguard its confidential and trade secret information.

56.  In addition to mandatory training, R1 has policies and procedures in place to ensure information security and R1 will issue bulletins and updates to remind and update its employees regarding such policies and procedures and to alert its employees regarding any threats and risks to R1's confidential and trade secret information.

57.  R1 also secures its information on company-controlled email networks and shared drives, which are either accessible via company-provided devices or are password-protected. Company-provided devices are password-protected, and employees must return them to R1 upon termination of employment.

58.  R1 further requires employees to return all company information to R1 upon termination.

**E.  Mr. Hicok's Access to and Development and Creation of R1's Confidential Information and Trade Secrets, Including Its Strategic Planning Documents and Competitive Analyses.**

59.  R1 has spent over twenty years aiming to transform the healthcare industry by providing innovative solutions to hospitals and healthcare systems.  R1's competitive advantage

16

is in its confidential and trade secret information that it has developed these past two decades through the investment of significant resources and money. In his various roles at R1, Mr. Hicok had access to and helped develop and refine the very information that has made R1 a leader in the RCM space.

60. As President of Revenue Performance Solutions, Mr. Hicok had unfettered access to R1's strategic planning documents, competitive analyses, and confidential business information. During his tenure, Mr. Hicok authored, edited, reviewed, or received virtually all significant strategy documents related to the RPS division.

61. Among the confidential material that Mr. Hicok possessed was R1's competitive intelligence matrix, a comprehensive analysis of more than fifty competitors across multiple service lines. This document evaluated competitors' capabilities in specific service areas including 340B DSH Medicare Bad Debt, SSIRD Worksheets, S10, AR Recovery, Complex Claims, Denials, Workers Compensation, Blue Card, Charge Capture, DRG Validation, and other revenue cycle management services. R1 protects such confidential and proprietary information from disclosure.

62. This competitive analysis specifically identified Knowtion Health as a direct competitor in multiple service lines where R1's RPS division operates, including complex claims, denials, and other core revenue cycle services. Mr. Hicok had access to and reviewed this competitive assessment as part of his regular duties.

63. Mr. Hicok also possessed R1's assessments of competitive threats and market opportunities. R1 maintains detailed analyses of competitors across priority tiers, evaluates their service offerings across dozens of categories, and develops specific strategies to compete against each rival. Mr. Hicok participated in creating and implementing these competitive strategies.

17

64. Mr. Hicok further had access to highly confidential information and trade secrets regarding R1's partnership with Palantir Technologies, a leader in artificial intelligence systems. In March 2025, while Mr. Hicok was President, RPS, R1 and Palantir announced the launch of R37, an advanced artificial intelligence lab dedicated to revolutionizing healthcare financial performance. The lab combines R1's deep category expertise in payer-provider dynamics and proprietary technology capabilities with Palantir's cutting-edge artificial intelligence tools. The lab will produce AI-powered agentic applications that will drive transformational benefits for R1's enterprise customers. Such information and technology is not public and is transformational to the industry. Yet, a month prior to Mr. Hicok's resignation from R1, Knowtion Health announced that it had plans to launch its own AI innovation lab. Mr. Hicok's involvement in the development and launch of R37 while at R1 presents an imminent threat of irreparable harm to R1 if he joins Knowtion Health.

65. Moreover, R1's business model in revenue cycle management requires building long-term relationships with healthcare providers. The confidential terms of R1's agreements with providers—including pricing structures, service delivery models, and system access requirements—reflect R1's competitive advantage in a highly competitive industry. Mr. Hicok knows these customers and knows their value to R1.

66. In sum, the types of information that Mr. Hicok had access to and helped develop and create, if obtained by a competitor like Knowtion Health, would eviscerate years of work and investment that R1 spent refining its business models to capitalize on its strengths.

**F.    Mr. Hicok's Systematic Derogation of R1's Contractual Rights.**

67. Upon learning that Mr. Hicok intended to leave R1 and Mr. Hicok's subsequent refusal to disclose where he intended to work after R1, R1 conducted an internal investigation.

18

R1's comprehensive review encompassed Mr. Hicok's emails, Microsoft Teams chats, SharePoint documents, deleted items, and other electronic communications from his tenure at R1.

68.     The forensic evidence reveals that over the six-month period leading to his August 2025 departure, Mr. Hicok engaged in an escalating campaign to undermine R1's restrictive covenants while, upon information and belief, preparing to join a direct competitor.  Beginning in February 2025, his communications show a pattern that escalated each month: from advising employees that R1's restrictive covenants would not be enforced (February), to coordinating challenges to restrictive agreements (March), to facilitating competitor recruitment (April), to removing protective provisions from a client contract (May), and finally to deploying deceptive messaging about his departure (August).

69.     Mr. Hicok systematically undermined R1's restrictive covenants by advising employees that R1 would not enforce them.  On February 3, 2025, when an R1 employee raised concerns about an employee refusing to sign an equity agreement due to "the solicit/compete section," Mr. Hicok responded via Teams message: "she's still at a level where I don't think enforcement is likely." This statement, made while serving as a senior R1 executive, effectively communicated to R1 employees that non-solicit and non-compete agreements were ineffective and unlikely to be enforced.

Kyle Hicok <KHicok@r1rcm.com>  2/3/2025  7:22 PM
she's still at a level where I don't think enforcement is likely

70.     Mr. Hicok coordinated efforts to challenge R1's restrictive covenant framework while still employed.  On March 25, 2025, R1 employees exchanged Teams messages discussing the need for external legal review to identify bases on which to avoid the restrictive covenants in "PIPA/non compete" agreements.  When an employee noted "we need a plan B" after his attorney

friend could not review the agreements "anytime soon," an employee revealed that "Kyle is also still running it down," demonstrating Mr. Hicok's active involvement in coordinating efforts to avoid R1's restrictive covenant protections.

71.     Mr. Hicok actively facilitated external recruiters' efforts to circumvent non-compete obligations.  On April 23, 2025, when an external recruiter inquired about former R1 employee Chris Carmichael, Mr. Hicok affirmatively responded via email: "Chris is just sitting out his non-compete. You should reach out to him."  Through this communication, Mr. Hicok directly connected an external recruiter with a former R1 employee he knew was bound by non-compete restrictions, actively facilitating potential competitive recruitment in violation of his fiduciary duties to R1.

72.     Mr. Hicok directed the removal of non-solicitation provisions from R1's business agreements.  On May 5, 2025, when asked whether to include a mutual non-solicit clause in a nondisclosure agreement with one of R1's clients, Mr. Hicok responded via email: "I would suggest taking it out completely."  This conduct was part of a pattern in which Mr. Hicok systematically worked to undermine and avoid R1's protective covenants.

73.     Mr. Hicok employed deceptive messaging to conceal his plans to join a competitor. Mr. Hicok has stated to his colleagues at R1, as well as to his social media network of over 7,000 followers, that he is "taking a break" rather than disclosing his plans to become CEO of Knowtion Health.  This deception demonstrates that Mr. Hicok was aware that his prospective employment would violate his obligations to R1.

**G.     Mr. Hicok Facilitated Knowtion Health's Corporate Raid of R1.**

74.     Mr. Hicok's departure was not an isolated event.   Based on R1's internal investigation to date, Knowtion Health has solicited and hired at least three additional R1

employees: (1) Adam Cartabiano (SVP – Small Market and Physician BD); (2) Peter Gehm (Regional Vice President); and (3) Sam Slappey (Vice President, Business Development). And, on knowledge and belief, Knowtion Health has hired or is in the process of hiring four other R1 employees.

75. On knowledge and belief, some or all of these hires were made by Knowtion Health with Mr. Hicok's assistance while still an R1 employee. R1's forensic review revealed that Mr. Hicok had direct communications with substantially all of the departing employees in the 90 days preceding their resignations. Many of these employees used nearly identical language in their resignation communications.

76. This mass exodus to a single competitor—combined with Mr. Hicok's documented efforts to undermine restrictive covenants and his connection to these departing employees— demonstrates a coordinated recruitment effort in violation of Mr. Hicok's contractual and fiduciary duties to R1.

**H.  Mr. Hicok Agrees to Join Knowtion Health as CEO.**

77. After months of deception to R1 about taking "a break," R1 learned in August 2025 that Mr. Hicok had, in fact, agreed to become Knowtion Health's Chief Executive Officer. This was no ordinary job change—Mr. Hicok would be leading R1's direct competitor.

78. When R1 discovered Mr. Hicok's improper conduct, R1 immediately sent letters to Mr. Hicok and Knowtion Health to protect R1's interests.

79. R1's August 25, 2025 letter to Mr. Hicok identified the ongoing restrictions Mr. Hicok agreed to as part of his Employment and Equity Agreements, including that he maintain the confidentiality of all sensitive business information, refrain from using or disclosing any of R1's trade secrets or confidential information, and refrain from employment with a competing business.

80.     R1's letter noted that in his former role as President, RPS, for R1, Mr. Hicok had access to highly confidential information related to R1's business processes and plans and that it would be difficult to see how Mr. Hicok could perform his new role as Knowtion Health's Chief Executive Officer without using R1's confidential information and trade secrets.

81.     On September 5, 2025, counsel for Mr. Hicok and Knowtion Health responded on behalf of both Mr. Hicok and Knowtion Health.  Notably, neither Mr. Hicok nor Knowtion Health denied that Mr. Hicok has been hired as Knowtion Health's new Chief Executive Officer.

82.     In fact, Mr. Hicok's and Knowtion Health's response validated R1's concerns.  The response provided no explanation as to how Mr. Hicok could serve as CEO of Knowtion Health without necessarily breaching his ongoing obligations to R1.

83.     On September 18, 2025, R1 wrote again to Mr. Hicok, demanding the return of $5,025,810.22 in equity compensation based on the breach of his restrictive covenants pursuant to the express terms of his Equity Agreements.  Based on the September 5, 2025 letter from Mr. Hicok's counsel, R1 reasonably anticipates that Mr. Hicok will refuse to comply with R1's demand.

**I.      Mr. Hicok's Breaches of His Agreements with R1 Threaten Irreparable Harm.**

84.     As CEO of Knowtion Health, Mr. Hicok cannot possibly perform his employment duties without using R1's confidential information and inevitably disclosing R1's trade secrets. He knows R1's pricing for its largest customers, the profit margins on specific services, which contracts are up for renewal and when, and the negotiating strategies that have proven successful. The inevitable disclosure of such highly confidential business information is precisely what Mr. Hicok's agreements were designed to prevent.

85.     The competitive intelligence Mr. Hicok possesses would give Knowtion Health an unfair advantage in the marketplace.  With Mr. Hicok's knowledge, Knowtion Health could underbid R1's contracts by knowing exactly what margins R1 needs to maintain, target R1's customers at precisely the right time before renewals, and replicate R1's successful strategies.

86.     In fact, Mr. Hicok's vast knowledge and familiarity with R1's partnership with Palantir to launch R37 is precisely the type of competitive intelligence Mr. Hicok possesses that would give Knowtion Health an unfair advantage, particularly given Knowtion Health's July 2025 announcement to launch a similar AI lab.

87.     The harm R1 faces is not speculative; it is real, imminent, and irreparable.  Mr. Hicok's employment at Knowtion Health would inevitably unleash years of accumulated confidential information into the hands of a direct competitor.  Once disclosed, this information cannot be "undisclosed."

88.     R1's customer relationships, built over years of trust and performance—and in turn R1's business—are at immediate risk.  Mr. Hicok knows not just who R1's customers are, but their key decision-makers, their preferences, their payment structure with R1, and exactly what it would take to poach them from R1.

89.     The damage extends beyond lost customers.  R1's entire competitive position in the marketplace would be compromised.  Its pricing strategies, operational methods, and strategic plans—all known to Mr. Hicok—would become an open book to its competitor.

90.     R1 has spent years and many millions of dollars developing its proprietary methods, building customer relationships, and creating competitive advantages in the marketplace.  All of this investment is at risk if Mr. Hicok is permitted to compete in violation of his obligations.

91.     By virtue of Mr. Hicok's former roles as CCO and President, RPS, at R1, he had access to, and was involved in the formulation of, certain confidential and trade secret information of R1, and it is inevitable that Mr. Hicok, as Knowtion Health's new Chief Executive Officer, will materially harm R1's business by competing with R1 and soliciting R1's employees and customers.

## CAUSES OF ACTION

## COUNT I - BREACH OF CONTRACT

### (2023 Employment Agreement)

92.     R1 incorporates the allegations set forth in Paragraphs 1-91 above as if fully set forth herein.

93.     R1 and Mr. Hicok entered into the written 2023 Employment Agreement on January 5, 2023.

94.     The 2023 Employment Agreement is a valid and binding contract between the parties.

95.     R1 has fully performed all of its obligations under the 2023 Employment Agreement.

96.     Mr. Hicok has breached and threatens to continue to breach Paragraphs 4(a), 4(b), and 4(e) of the 2023 Employment Agreement by: (1) preparing to compete and competing with R1 through his intended employment with Knowtion Health; (2) using R1's confidential information outside the scope of his employment for R1, and in furtherance of Knowtion Health, a competing company; (3) directly interfering with the employment relationship between R1 and its employees by assisting Knowtion Health in hiring them and in undermining the validity of key employment terms; (4) facilitating the solicitation of R1 employees to join Knowtion Health; and

(5) soliciting sales on behalf of Knowtion Health with the same customers to which R1 sells its products and services.

97.     As Mr. Hicok agreed in the 2023 Employment Agreement, "any breach of any of the restrictive covenants [in this Agreement] would cause R1 substantial, continuing and irrevocable harm for which money damages would be inadequate.  Therefore, in the event of any such breach or any threatened breach . . . in addition to such other remedies as may be available, R1 shall be entitled to specific performance and temporary, preliminary, and/or permanent injunctive relief."  (Ex. B, ¶ 4.g.)

98.     As a result of these breaches, R1 has been, and continues to be, injured and faces irreparable injury.  R1 is threatened with losing investment, its clients, its competitive advantage, and its trade secrets in amounts that are not possible to determine, unless Mr. Hicok is enjoined and restrained by order of this Court.

## COUNT II - BREACH OF CONTRACT

### (2025 Employment and PIPA Agreements)

99.     R1 incorporates the allegations set forth in Paragraphs 1-91 above as if fully set forth herein.

100.    R1 and Mr. Hicok entered into the written 2025 Employment Agreement and the 2025 Proprietary Interests Protection Agreement on January 6, 2025.

101.    The 2025 Employment Agreement and 2025 PIPA are valid and binding contracts between the parties.

102.    The 2025 Employment Agreement incorporates the 2025 PIPA by reference.

103.    R1 has fully performed all of its obligations under the 2025 Employment and PIPA Agreements, including paying Mr. Hicok substantial compensation for his work.

104.     Mr. Hicok has breached and threatens to continue to breach Paragraphs D and E of the 2025 PIPA by: (1) using R1's confidential information outside the scope of his employment for R1, and in furtherance of Knowtion Health, a competing company; (2) directly interfering with the employment relationship between R1 and its employees by assisting Knowtion Health in hiring them and in undermining the validity of key employment terms; (3) facilitating the solicitation of R1 employees to join Knowtion Health; and (4) soliciting sales on behalf of Knowtion Health with the same customers to which R1 sells its products and services.

105.     Mr. Hicok's breach of the 2025 Employment and PIPA Agreements with R1 would cause foreseeable damage to R1, including the loss of investment, loss of value of its trade secrets, and loss of future investment opportunities.

106.     As Mr. Hicok agreed in the PIPA, "any breach or threatened breach by Employee of this Agreement may cause continuing and irreparable injury to the Company for which money damages may not be an adequate remedy," and R1 "may, in addition to any other rights or remedies they may have, be entitled to temporary, preliminary and/or final injunctive relief for any breach or threatened breach by Employee of any part of this Agreement." (Ex. D, ¶ K.)

107.     As a result of these breaches, R1 has been, and continues to be, injured and faces irreparable injury.  R1 is threatened with losing investment, its clients, its competitive advantage, and its trade secrets in amounts that are not possible to determine, unless Mr. Hicok is enjoined and restrained by order of this Court.

## COUNT III - BREACH OF CONTRACT

### (2022 Grant of Performance Based Awards Agreement)

108.     R1 incorporates the allegations set forth in Paragraphs 1-91 above as if fully set forth herein.

109. R1 and Mr. Hicok entered into the written 2022 Grant of Performance Based Awards Agreement on June 21, 2022.

110. The 2022 Grant of Performance Based Awards Agreement is a valid and binding contract between the parties.

111. R1 has fully performed all of its obligations under the 2022 Grant of Performance Based Awards Agreement, including granting Mr. Hicok the "substantial economic benefit" of the identified performance-based Restricted Stock Units. This includes granting Mr. Hicok 121,029 restricted units valued at $1,730,716.42.

112. Mr. Hicok has breached and threatens to continue to breach Paragraphs 9(b), 9(c), and 9(f) of the 2022 Grant of Performance Based Awards Agreement by: (1) preparing to compete and competing with R1 through his intended employment with Knowtion Health; (2) using R1's confidential information outside the scope of his employment for R1, and in furtherance of Knowtion Health, a competing company; (3) directly interfering with the employment relationship between R1 and its employees by undermining the validity of key employment terms; (4) facilitating the solicitation of R1 employees to join Knowtion Health; and (5) soliciting sales on behalf of Knowtion Health with the same customers to which R1 sells its products and services.

113. As Mr. Hicok agreed in the 2022 Grant of Performance Based Awards Agreement, following a breach of the restrictive covenants in the agreement, and "in the event that the Participant sold the PBRSU Shares issued to the Participant pursuant to this Agreement, then the Participant shall be required to pay to the Company in cash, within thirty (30) days of a request by the Company for such payment, the price at which the Participant sold the shares." (Ex. E, ¶ 9(h).)

114. As Mr. Hicok also agreed in the 2022 Grant of Performance Based Awards Agreement "any breach of any of the restrictive covenants in this Agreement would cause the

Company substantial, continuing, and irrevocable harm for which money damages would be inadequate and therefore, in the event of any such breach or any threatened breach, in addition to such other remedies as may be available, the Company shall be entitled to specific performance and injunctive relief." (*Id.*)

115. As a result of these breaches, R1 has been, and continues to be, injured and faces irreparable injury. R1 is threatened with losing investment, its clients, its competitive advantage, and its trade secrets in amounts that are not possible to determine, unless Mr. Hicok is enjoined and restrained by order of this Court.

## COUNT IV - BREACH OF CONTRACT

### (2023 Grant of Performance Based Awards Agreement)

116. R1 incorporates the allegations set forth in Paragraphs 1-91 above as if fully set forth herein.

117. R1 and Mr. Hicok entered into the written 2023 Grant of Performance Based Awards Agreement on May 2, 2023.

118. The 2023 Grant of Performance Based Awards Agreement is a valid and binding contract between the parties.

119. R1 has fully performed all of its obligations under the 2023 Grant of Performance Based Awards Agreement, including granting Mr. Hicok the "substantial economic benefit" of the identified performance-based Restricted Stock Units. This includes granting Mr. Hicok 82,323 restricted units valued at $1,117,215.33.

120. Mr. Hicok has breached and threatens to continue to breach Paragraphs 9(b), 9(c), and 9(f) of the 2023 Grant of Performance Based Awards Agreement by: (1) preparing to compete and competing with R1 through his intended employment with Knowtion Health; (2) using R1's

28

confidential information outside the scope of his employment for R1, and in furtherance of Knowtion Health, a competing company; (3) directly interfering with the employment relationship between R1 and its employees by undermining the validity of key employment terms; (4) facilitating the solicitation of R1 employees to join Knowtion Health; and (5) soliciting sales on behalf of Knowtion Health with the same customers to which R1 sells its products and services.

121.   As Mr. Hicok agreed in the 2023 Grant of Performance Based Awards Agreement, following a breach of the restrictive covenants in the agreement, and "in the event that the Participant sold the PBRSU Shares issued to the Participant pursuant to this Agreement, then the Participant shall be required to pay to the Company in cash, within thirty (30) days of a request by the Company for such payment, the price at which the Participant sold the shares." (Ex. F, ¶ 9(f).)

122.   As Mr. Hicok also agreed in the 2023 Grant of Performance Based Awards Agreement, "any breach of any of the restrictive covenants in this Agreement would cause the Company substantial, continuing, and irrevocable harm for which money damages would be inadequate and therefore, in the event of any such breach or any threatened breach, in addition to such other remedies as may be available, the Company shall be entitled to specific performance and injunctive relief." (*Id.*)

123.   As a result of these breaches, R1 has been, and continues to be, injured and faces irreparable injury.  R1 is threatened with losing investment, its clients, its competitive advantage, and its trade secrets in amounts that are not possible to determine, unless Mr. Hicok is enjoined and restrained by order of this Court.

## COUNT V - BREACH OF CONTRACT

### (2023 Restricted Stock Unit Award Agreement)

124.    R1 incorporates the allegations set forth in Paragraphs 1-91 above as if fully set forth herein.

125.    R1 and Mr. Hicok entered into the written 2023 Restricted Stock Unit Award Agreement on May 2, 2023.

126.    The 2023 Restricted Stock Unit Award Agreement is a valid and binding contract between the parties.

127.    R1 has fully performed all of its obligations under the 2023 Restricted Stock Unit Award Agreement, including granting Mr. Hicok the "substantial economic benefit" of the identified Restricted Stock Units.  This includes granting Mr. Hicok 15,907 restricted units valued at $227,470.10.

128.    Mr. Hicok has breached and threatens to continue to breach Paragraphs 9(b), 9(c), and 9(f) of the 2023 Restricted Stock Unit Award Agreement by: (1) preparing to compete and competing with R1 through his intended employment with Knowtion Health; (2) using R1's confidential information outside the scope of his employment for R1, and in furtherance of Knowtion Health, a competing company; (3) directly interfering with the employment relationship between R1 and its employees by undermining the validity of key employment terms; (4) facilitating the solicitation of R1 employees to join Knowtion Health; and (5) soliciting sales on behalf of Knowtion Health with the same customers to which R1 sells its products and services.

129.    As Mr. Hicok agreed in the 2023 Restricted Stock Unit Award Agreement, following a breach of the restrictive covenants in the agreement, and "in the event that the Participant sold the shares of Restricted Stock issued to the Participant pursuant to this Agreement,

then the Participant shall be required to pay to the Company in cash, within thirty (30) days of a request by the Company for such payment, the price at which the Participant sold the shares." (Ex. G, ¶ 9(h).)

130.    As Mr. Hicok also agreed in the 2023 Restricted Stock Unit Award Agreement, "any breach of any of the restrictive covenants in this Agreement would cause the Company substantial, continuing, and irrevocable harm for which money damages would be inadequate and therefore, in the event of any such breach or any threatened breach, in addition to such other remedies as may be available, the Company shall be entitled to specific performance and injunctive relief." (*Id.*)

131.    As a result of these breaches, R1 has been, and continues to be, injured and faces irreparable injury.  R1 is threatened with losing investment, its clients, its competitive advantage, and its trade secrets in amounts that are not possible to determine, unless Mr. Hicok is enjoined and restrained by order of this Court.

## COUNT VI - BREACH OF CONTRACT
### (2024 Grant of Performance Based Awards Agreement)

132.    R1 incorporates the allegations set forth in Paragraphs 1-91 above as if fully set forth herein.

133.    R1 and Mr. Hicok entered into the written 2024 Grant of Performance Based Awards Agreement on June 1, 2024.

134.    The 2024 Grant of Performance Based Awards Agreement is a valid and binding contract between the parties.

135.    R1 has fully performed all of its obligations under the 2024 Grant of Performance Based Awards Agreement, including granting Mr. Hicok the "substantial economic benefit" of the

31

identified performance-based Restricted Stock Units. This includes granting Mr. Hicok 103,269 restricted units valued at $1,476,752.28.

136. Mr. Hicok has breached and threatens to continue to breach Paragraphs 9(b), 9(c), and 9(f) of the 2024 Grant of Performance Based Awards Agreement by: (1) preparing to compete and competing with R1 through his intended employment with Knowtion Health; (2) using R1's confidential information outside the scope of his employment for R1, and in furtherance of Knowtion Health, a competing company; (3) directly interfering with the employment relationship between R1 and its employees by undermining the validity of key employment terms; (4) facilitating the solicitation of R1 employees to join Knowtion Health; and (5) soliciting sales on behalf of Knowtion Health with the same customers to which R1 sells its products and services.

137. As Mr. Hicok agreed in the 2024 Grant of Performance Based Awards Agreement, following a breach of the restrictive covenants in the agreement, and "in the event that the Participant sold the PBRSU Shares issued to the Participant pursuant to this Agreement, then the Participant shall be required to pay to the Company in cash, within thirty (30) days of a request by the Company for such payment, the price at which the Participant sold the shares." (Ex. H, ¶ 9(h).)

138. As Mr. Hicok also agreed in the 2024 Grant of Performance Based Awards Agreement, "any breach of any of the restrictive covenants in this Agreement would cause the Company substantial, continuing, and irrevocable harm for which money damages would be inadequate and therefore, in the event of any such breach or any threatened breach, in addition to such other remedies as may be available, the Company shall be entitled to specific performance and injunctive relief." (*Id.*)

139. As a result of these breaches, R1 has been, and continues to be, injured and faces irreparable injury. R1 is threatened with losing investment, its clients, its competitive advantage,

32

and its trade secrets in amounts that are not possible to determine, unless Mr. Hicok is enjoined and restrained by order of this Court.

## COUNT VII - BREACH OF CONTRACT

### (2024 Restricted Stock Unit Award Agreement)

140.    R1 incorporates the allegations set forth in Paragraphs 1-91 above as if fully set forth herein.

141.    R1 and Mr. Hicok entered into the written 2024 Restricted Stock Unit Award Agreement on June 1, 2024.

142.    The 2024 Restricted Stock Unit Award Agreement is a valid and binding contract between the parties.

143.    R1 has fully performed all of its obligations under the 2024 Restricted Stock Unit Award Agreement, including granting Mr. Hicok the "substantial economic benefit" of the identified Restricted Stock Units.  This includes granting Mr. Hicok 28,927 restricted units valued at $413,656.10.

144.    Mr. Hicok has breached and threatens to continue to breach Paragraphs 9(b), 9(c), and 9(f) of the 2024 Restricted Stock Unit Award Agreement by: (1) preparing to compete and competing with R1 through his intended employment with Knowtion Health; (2) using R1's confidential information outside the scope of his employment for R1, and in furtherance of Knowtion Health, a competing company; (3) directly interfering with the employment relationship between R1 and its employees by undermining the validity of key employment terms; (4) facilitating the solicitation of R1 employees to join Knowtion Health; and (5) soliciting sales on behalf of Knowtion Health with the same customers to which R1 sells its products and services.

145.     As Mr. Hicok agreed in the 2024 Restricted Stock Unit Award Agreement, following a breach of the restrictive covenants in the agreement, and "in the event that the Participant sold the shares of Restricted Stock issued to the Participant pursuant to this Agreement, then the Participant shall be required to pay to the Company in cash, within thirty (30) days of a request by the Company for such payment, the price at which the Participant sold the shares." (Ex. I, ¶ 9(h).)

146.     As Mr. Hicok also agreed in the 2024 Restricted Stock Unit Award Agreement, "any breach of any of the restrictive covenants in this Agreement would cause the Company substantial, continuing, and irrevocable harm for which money damages would be inadequate and therefore, in the event of any such breach or any threatened breach, in addition to such other remedies as may be available, the Company shall be entitled to specific performance and injunctive relief." (*Id.*)

147.     As a result of these breaches, R1 has been, and continues to be, injured and faces irreparable injury.  R1 is threatened with losing investment, its clients, its competitive advantage, and its trade secrets in amounts that are not possible to determine, unless Mr. Hicok is enjoined and restrained by order of this Court.

### COUNT VIII - BREACH OF CONTRACT

### (2025 Class P Unit Award Agreement)

148.     R1 incorporates the allegations set forth in Paragraphs 1-91 above as if fully set forth herein.

149.     R1 and Mr. Hicok entered into the written 2025 Class P Unit Award Agreement on January 5, 2025.

150.     The 2025 Class P Unit Award Agreement is a valid and binding contract between the parties.

151.     R1 has fully performed all of its obligations under the 2025 Class P Unit Award Agreement.

152.     Mr. Hicok has breached and threatens to continue to breach Paragraphs 7.1(a) and 7.3 the 2025 Class P Unit Award Agreement by:  (1) using R1's confidential information outside the scope of his intended employment for R1, and in furtherance of Knowtion Health, a competing company; (2) directly interfering with the employment relationship between R1 and its employees by undermining the validity of key employment terms; (3) facilitating the solicitation of R1 employees to join Knowtion Health; and (4) soliciting sales on behalf of Knowtion Health with the same customers to which R1 sells its products and services.

153.     As Mr. Hicok agreed in the 2025 Class P Unit Award Agreement, "[a]ll vested and unvested Class P Units shall be immediately forfeited upon … breach of any restrictive covenants." (Ex. J, ¶ 4.2(b).)

154.     As Mr. Hicok agreed in the 2025 Class P Unit Award Agreement, "any breach by Participant of this Agreement will cause continuing and irreparable injury to the R1 Company for which money damages would not be an adequate remedy" and R1 "shall, in addition to any other rights or remedies they may have, be entitled to injunctive relief for any breach by Participant of any part of this Agreement."  (*Id.* at ¶ 7.4.)

155.     As a result of these breaches, R1 has been, and continues to be, injured and faces irreparable injury. R1 is threatened with losing investment, its clients, its competitive advantage, and its trade secrets in amounts that are not possible to determine, unless Mr. Hicok is enjoined and restrained by order of this Court.

## COUNT IX - BREACH OF FIDUCIARY DUTIES

156.     R1 incorporates the allegations set forth in Paragraphs 1-91 above as if fully set forth herein.

157.     Mr. Hicok was an Officer of R1 and thus owed the fiduciary duties of loyalty and care owed by corporate officers under Delaware law.

158.     Officers of Delaware corporations owe a duty of loyalty to the corporation and its stockholders, which includes a duty of obedience to the officers' principal or more senior agents of the corporation.

159.     Officers of Delaware corporations also owe duties of good faith and candor as subsidiary requirements of the duty of loyalty.

160.     Mr. Hicok breached his fiduciary duty of loyalty by encouraging his subordinates to leave R1 for Knowtion Health, a competitor, and to disregard key legal covenants of their employment agreements.  Mr. Hicok also broadly sought to manipulate restrictive covenant language throughout R1's employment and equity agreements, and to limit and undermine the enforceability of R1's restrictive covenants, for his personal benefit.

161.     In doing so, Mr. Hicok also breached his fiduciary duty of loyalty by undermining the interests of R1 management and stockholders by encouraging vital R1 employees to seek employment with a direct competitor in contradiction with the terms of their employment agreements.

162.     The employment provisions Mr. Hicok explicitly undermined play a foundational role in protecting R1's confidential information.

163.     R1 has suffered harm as a result of Mr. Hicok's breaches of his fiduciary duties.

## COUNT X - MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836

164.    R1 incorporates the allegations set forth in Paragraphs 1-91 above as if fully set forth herein.

165.    Mr. Hicok is prohibited by the Defend Trade Secrets Act, 18 U.S.C. §§ 1833, 1836, et seq. (the "DTSA"), from using, disclosing, and misappropriating R1's trade secrets.

166.    R1's trade secrets—including, but not limited to, information concerning customers, prospective customers, customer and prospective customer lists, purchasing volumes, sales histories and trends, business and marketing plans and methods, cost and pricing information, pricing and discount policies and profit margins, customer quotes and contracts, sales forecasts and projections, personnel data, and proprietary project-level information and technology, such as R1's partnership with Palantir Technologies and the launch of R37—have independent economic value, are unique to R1's business, and are not generally known and not readily ascertainable by proper means by other persons or entities, who can obtain economic value from their use.  R1 acquired rights in its trade secrets at great time, effort, and expense and for R1's benefit.

167.    R1's trade secrets provide important commercial and competitive advantages to R1 in a highly competitive industry.

168.    R1's trade secrets are not available to the general public and cannot be duplicated without access to them.  R1's trade secrets depend on sources of information and analyses of information that cannot be accessed by a competitor and cannot be recreated by a competitor.

169.    R1 has taken, and continues to take, reasonable and adequate precautions to protect its trade secrets and other confidential information, including, but not limited to: (a) use of policies prohibiting disclosure of confidential information, (b) use of nondisclosure agreements, (c) restrictions on access to electronically stored confidential information, such as password

protection, and (d) use of systems and protocols that affirmatively block access to certain types of data or use.

170.    Mr. Hicok's actions, as fully set forth above, constitute threatened misappropriation of R1's trade secrets in violation of the DTSA.

171.    Mr. Hicok's actions were willful and malicious and were committed with actual malice and with the intent to injure R1 and its business.

172.    R1 has suffered, continues to suffer, and will continue to suffer, irreparable harm and damage, including, but not limited to, a loss of competitive advantage, loss of business, and loss of goodwill, from Mr. Hicok's engaging in these unlawful activities.

173.    As a result of Mr. Hicok's conduct, R1 will also suffer loss of income, and/or lost sales/profits, resulting in damages in excess of $75,000.

174.    R1 is entitled to injunctive relief under, and any and all actual or statutory damages provided by, the DTSA, including exemplary damages for willful violations of the DTSA in the amount of twice the actual damages proven at trial.

## COUNT XI - MISAPPROPRIATION OF TRADE SECRETS UNDER THE ILLINOIS TRADE SECRETS ACT, 765 ILCS 1065

175.    R1 incorporates the allegations set forth in Paragraphs 1-91 above as if fully set forth herein.

176.    Mr. Hicok is prohibited by the Illinois Trade Secrets Act, 765 ILCS 1065 (the "ITSA"), from using, disclosing, and misappropriating R1's trade secrets.

177.    R1's trade secrets—including, but not limited to, information concerning customers, prospective customers, customer and prospective customer lists, purchasing volumes, sales histories and trends, business and marketing plans and methods, cost and pricing information, pricing and discount policies and profit margins, customer quotes and contracts, sales forecasts

and projections, personnel data, and proprietary project-level information and technology, such as R1's partnership with Palantir Technologies and the launch of R37—have independent economic value, are unique to R1's business, and are not generally known and not readily ascertainable by proper means by other persons or entities, who can obtain economic value from their use. R1 acquired rights in its trade secrets at great time, effort, and expense and for R1's benefit.

178. R1's trade secrets provide important commercial and competitive advantages to R1 in a highly competitive industry.

179. R1's trade secrets are not available to the general public and cannot be duplicated without access to them. R1's trade secrets depend on sources of information that cannot be accessed by a competitor and cannot be recreated by a competitor.

180. R1 has taken, and continues to take, reasonable and adequate precautions to protect its trade secrets and other confidential information, including, but not limited to: (a) use of policies prohibiting disclosure of confidential information, (b) use of nondisclosure agreements, (c) restrictions on access to electronically stored confidential information, such as password protection, and (d) use of systems and protocols that affirmatively block access to certain types of data or use.

181. Mr. Hicok's actions, as fully set forth above, constitute threatened misappropriation of R1's trade secrets in violation of the ITSA.

182. Mr. Hicok's actions were willful and malicious and were committed with actual malice and with the intent to injure R1 and its business.

183. R1 has suffered, continues to suffer, and will continue to suffer, irreparable harm and damage, including, but not limited to, a loss of competitive advantage, loss of business, and loss of goodwill, from Mr. Hicok's engaging in these unlawful activities.

39

184.    As a result of Mr. Hicok's conduct, R1 will also suffer loss of income, and/or lost sales/profits, resulting in damages in excess of $75,000.

185.    R1 is entitled to injunctive relief under, and any and all actual or statutory damages provided by, the ITSA, including exemplary damages for willful violations of the ITSA in the amount of twice the actual damages proven at trial.

**PRAYER FOR RELIEF**

Wherefore, R1 requests the following relief:

1.    Preliminary and permanent injunctive relief preventing Mr. Hicok from assuming the role of CEO of Knowtion Health for a period of 24 months following his separation from R1;

2.    Preliminary and permanent injunctive relief restraining Mr. Hicok's use, disclosure, or misappropriation of R1's confidential, proprietary, or trade secret information;

3.    Disgorgement of compensation paid by R1 to Mr. Hicok in each and all of the Equity Agreements, in an amount of at least $5,025,810.22;

4.    An award of compensatory damages, in an amount to be determined at trial, including pre-judgment and post-judgment interest, attorneys' fees, costs, and disbursements, for Mr. Hicok's willful and unlawful actions against R1;

5.    An award of nominal damages, in an amount to be determined at trial, to remedy the harm to R1 caused by Mr. Hicok;

6.    An award of punitive damages for Mr. Hicok's willful and malicious breach of the DTSA and ITSA;

7.  An award of attorneys' fees and costs as provided in the DTSA and ITSA; and

8.  Such other and further relief as the Court deems just and proper.

## JURY DEMAND

R1 hereby demands a trial by jury as to all issues that may be tried before a jury under applicable law.


Dated:  September 19, 2025                    */s/ Leonid Feller, P.C.*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Leonid Feller, P.C. (#6274905)
Charles W. Douglas, Jr. (#6289391)
Christina E. Sharkey (#6316735)
Viviana Aldous (#6320208)
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
leonidfeller@quinnemanuel.com
charlesdouglas@quinnemanuel.com
christinasharkey@quinnemanuel.com
vivianaaldous@quinnemanuel.com

*Counsel for Plaintiffs*